2323 well before you call the case. Could you please verify the presence so miss O'Donoho? Can you hear us? Yes, I can I can't see myself on the screen, but maybe I'm not supposed to I did on mute And I have video and audio on can you see the timer? Yes, I can Mr.. Stone yes president. I can see the timer. Can you turn your camera on? I There you go, thank you Thanks All right madam clerk, please call the next case for argument case number 19 23 23 Twyla McElroy at all versus City of Cedar Rapids at all 2323 Very well miss O'Donoho. We'll we'll hear from you first all right. Thank you your honor if it pleases the court and Mr.. Stone as well as my client miss McElry who is here with me this case involves the shooting death of young man by the name of Jonathan Gossman on October 20th 2015 in Cedar Rapids, Iowa And the shooting was performed by two officers Lucas Jones and Mr.. Garren officer Geringer The front I I believe that the case as a whole is analyzed under the Fourth Amendment of the US Constitution Article 1 section 8 of the Iowa Constitution the Iowa Common Law and Chapter 670 which is the municipal torts act of the Iowa code I divided the case into parts the first one involves the legality of the initial stop based on Not based on reasonable suspicion the second one is the ordering of mr. Gossman out of the car and the third is the pursuit and ultimate killing mr. Gossman I wanted to talk a little bit about the appendix because it's voluminous and It might be a little bit difficult to to identify the core materials, so I thought I would try to do that Somewhat unusually we have an audio recording which began during the surveillance of mr. Gossman and Continued past the time that he was killed And that's at the appendix 713 through 738 And that's it's also on a flash drive the 713 through 738 is a transcript that was prepared by the office assistant of Mr. Stone Appreciate your flagging those for us, but I know your time is limited And I think you can assume we've looked at the record so if you want to focus on your legal contentions that might be Okay, I also didn't want to say that there there are There are basically three places where Geringer and Jones Indicated their stories and they evolved and I think there's obviously a dispute between the various versions, so I wanted you to be aware of that you've got the the initial interview by the DCI Whatever they said on the audio and then What was said in the depositions? Okay, you could you go ahead and tell us so what what facts do you claim were? Interpreted in the light most favorable to the defendants rather than to your client. Okay. Well beginning with the illegal stop I believe that the if you interpret the facts in the light most favorable to mr Gossman's estate that all you can say is The officers knew that two people had brought purchased one package of pseudofedron product And they weren't necessarily attached to that vehicle they could have been but there was no certainty whatsoever and That at some time prior to these purchases somebody that was in the truck had some conversation Rather brief with a guy named Steve Turner who was known to the police as having Manufactured methamphetamines. I think that's it for what the facts would show and I don't think it amounts to reasonable suspicion I think that if you look at the recording the audio recording at at 955 which is a pp 943 What you know is that at 955 somebody popped up and There were at least they think it was miss Santos But they saw a sweatshirted person who wasn't identified and maybe a female Who was it who could be Santos but was not necessarily Santos leave the store and go to the truck Then at 1012 something popped up regarding mr. Gossman and They didn't see him leave but Or they did see him leave, but they didn't see him with anything in his hand And so they did and they didn't know for sure that it was mr. Gossman. They called him. Mr. Grossman So the other fact that I guess if these individuals were in fact the two purchasers Identified is that they didn't purchase more than seven hundred seven thousand five hundred milligrams during the 30 days They didn't pop up as something somebody that purchased a lot of routinely purchased a lot of Pseudofibin products, I think turning to the law I don't believe there is any case as thin as this one that says there's reasonable suspicion To stop a vehicle I think the if you look at amyling that seems to be relied upon quite a bit by both myself and The defendants as well as the court to me that gives a good example of what needs to be Observed before you have reasonable suspicion here. They had two purchasers. They observed them Outside the store inside the store. They could see what they were actually purchasing inside the store and They identified the fact that not only did they purchase pseudofibin products, but they also purchased lithium batteries at a different store so my point here is they clearly had a lot more to go on to identify the Individuals that were stopped on reasonable suspicion for the crime Looking at the state side of it. We have state fee never girl Gil and basically what that did is also indicate that you need surveillance both inside and outside and There they saw the two people both entering and exiting. So, you know from my standpoint, I think a more Accurate view of what's required for reasonable suspicion is in people V steel Which is a Michigan case at 806 Northwest second seven five five Where basically it was the fact that they observed people They had had information specifically identifying them and they purchased more than one product it was a combination of products that might indicate an intent to manufacture pseudofibin because as we know, it's not a law violation to Purchase a package of pseudofibin per se So in order to analyze these facts the court had to find out or establish that there was no Particularized objective basis for supporting There was a particularized objective basis for supporting the fact that there was a Reasonable suspicion somebody was buying products to manufacture pseudofibin And I don't think that court You know succeeded in finding those facts. I think if you look at the appendix 1816 to 1822 I filed a motion to alter or amend and I had an exhibit a where I Analyzed what the court said versus what the record said on each point So I guess summarizing the stop I would say that clearly they didn't have reasonable suspicion to stop the car They had a lot of speculation if you listen to the audio, you'll see they got rather carried away about it What might be happening, but I don't think they had reasonable suspicion to stop The next question is whether they had The authority to order. Mr. Gossman out of the car and I I think that what was being cited by both the court and the defendants is Penn Pennsylvania versus MIM and the way I read that case it says if you lawfully stopped the vehicle Then you have the right to order somebody out of the vehicle But you don't have the right to order them out of the vehicle if you didn't stop them originally Counsel due to time constraints. I'd like to ask a question about the excessive force claim if I could As I understand it, there is a two-second time period Between the time when mr Gossman responded all right to the command to put his hands on his head And the time that the order was given for the dog to attack him But I'd like to ask you is what does a record show happen during that two-second time period? Yeah, I don't think there's a whole lot shown, but it's only two seconds. I mean, I think everybody agrees that Mr. Gossman did a light from the car, but to be fair. I think he alighted because officer Julius opened the door and told Why do you mean he? Appeared to be fleeing or just got out of the car my it's my opinion He didn't have time to to formulate any theory of fleeing I think that was formulated as soon as the dog was on it within two seconds, and then he was from the dog Is there something in the record that shows why the dog was ordered to attack after he got out of the car? Well, you know if you look at the initial DCI interview of officer Jones I mean he makes it sound like it was quite a bit later in The continuum that he actually ordered the dog in other words. He claims he observed Boisenberg and Boisenberg having trouble and then You know he wanted the dog to come in to take care of the situation And I don't believe that there's enough time for all that to happen so I basically I think two seconds that would be about as much time as it would take to get out of a car and Go ahead judge. No finish your line Do you dispute the fact that Or the allegation that between the time he exited the vehicle and the time the shots were fired He had transferred a handgun from his pants to his head Um Yeah, I do dispute that as I think what the record shows is that he had baggy pants He was holding his waistband. I think that Geringer even said it looked like he was trying to hold his pants up while he was Running or not running very quickly around the car and up the sidewalk and that The gun didn't appear until the dog had him on the ground and his pants were down So I guess he didn't have the gun in his hand did he not? Only after he was on the ground and his pants were down So I mean, I guess my feeling there is that you know He was trying to not involve the gun trying to hide the gun trying not to be threatening trying to get away with the dog on his heels and that because the dog got him down and Bit, you know both both cuffs and and in the flesh of the right hand and on his head No, I don't think he had any ability to control his actions to try to get anything out of his Waistband or pointed at anybody and well I the question isn't really though whether he had ability to control is it it's what a reasonable officer Would have perceived and so the question is did he have gun in his hand in a way that a reasonable officer could have believed was Threatening that's that is the question and my answer didn't intend anything by it We know what the officer reasonably could have believed so Officer said is that he saw an arm trailed across the chest He didn't say that the gun was pointed at anybody and he didn't say that he you know, not and realistically, you know Part of the problem is it was dark, but you know, he did it's not like he made eye contact with. Mr. Grossman and saw that he was trying to to aim at him So I would say no, he was on the ground and he was being pulled around by the dog I think all they had to do is Probably wait it out or they could have tased him, you know Officer Jones had his taser out earlier if there's really no explanation why I didn't tase him if he was worried about it But I thought was the place where he was Shot from the car where he exited the car Well, I don't think we know exactly but I believe they said it was several driveways So I would say it's not very far because I'm confused about the two-second discussion earlier Then I thought you made it sound like you thought the dog Was after him within two seconds when he got out of the car, but if he was that far away several driveways away from the car How could that how could it be that the dog was after him within two seconds? Well, the command was made within two seconds And I think if you if you especially concentrate on Geringer's version of things I mean he said he immediately got out of the way because he was afraid of getting bitten And and he didn't really know what to do. That was part of the problem I haven't even talked about policies, but they didn't follow any of their policies the person in command at the scene was Juleps, he didn't ask the dog to be deployed The dog was not deployed according to the canine policy or according to the use of force policy There was no at that point no crime that could have been committed in terms of probable cause that would substantiate the use of Severe force maybe not it wasn't deadly until the the he was shot But if you look at the continuum in the use of force policy, it's it's a medium measure Both using the canine and using the taser would have been as well So no, I I don't think there's any indication that they were in danger I think Geringer was panicked and Jones was responding to Geringer and so he shot him 16 times in the back of the neck and the head and the shoulders. I See I'm out of time. Yes. Thank you for your argument We'll hear from Mr. Stone May it please support court good afternoon miss O'Donoghue. This is Wilford Stone I'm sitting here in my office in Cedar Rapids, Iowa and on behalf of the city of Cedar Rapids defendants We request that you affirm the district courts order Judge Grand interpreted all facts and the light most favorable to the plaintiffs and drew all reasonable inferences in their favor and The court's reasoning and the six lead cases that he cited not only the ambling and Binion case that miss O'Donoghue referenced but the four use of force cases Are all consistent with this court's prior rulings on alleged constitutional violations for excessive force and uses of force Mr. Gossman was a threat to the officers for essentially the entire time after the vehicle stopped The record shows that between the time a shotgun was located and the shots were fired 37 seconds elapsed between the time that the dog was released and Mr. Gossman was shot 21 seconds have passed and as the Supreme Court found in the Casella versus Hughes case from 2018 and would say granted qualified immunity that case occurred in fact under a minute And so it clearly fell into the well-established often cited scenarios of split-second judgments and circumstances that are tense uncertain and rapidly evolving and Written by Judge Colleton Liggins versus Cohen in the city of st. Louis reversed a denial of summary judgment to a police officer and whether the use of force was objectively reasonable where the Suspect in that case came flying out of a breezeway and encountered an officer the officer had only a second or two to react Court found there that in a situation where it's tense and uncertain There's simply no time to wait and see that an officer is entitled to use deadly force Similarly miss O'Donoghue claims that a taser should have been implemented But this court has made it very clear that you are going to not Scrutinize a particular tactical decision that an officer doesn't need to pursue the most prudent course as long as the course that's chosen is Objectively reasonable, that's what Judge Colleton wrote in the Zubrod case versus Worth County That's what both Judge Colleton and Grunder said and wrote Retz versus Seton from 2014 The court expressly said in the Retz case for example that the court will not engage in Monday morning quarterbacking of other available methods If the force was reasonable and the officers allowed to choose the most port the most prudent course of action Counselor, I don't think there's any dispute about the applicable law here What I'm interested in having you expound on is Taking it a lot most favorable to the plaintiff. What what happened between the time he said all right To the command to put his hands on his head at the time the dog was ordered to attack him so your honor the undisputed facts indicate that after He was he said all right that he was commanded to get out of the vehicle Officer Bosenberg had his gun drawn because there was an indication that there's a shotgun in the backseat When mr. Gossman Shuffled and went to move himself out of the vehicle he pushed the car door into sergeant Jules and immediately took off running around the back of the vehicle and Then proceeded westerly down the road, which is at what time? Officer Jones released the canine officer officer Bain and officers Geringer and Jones then proceeded to chase him So that is the undisputed facts that are in the record and the officers View of that is is unrebutted by any other evidence It's also supported by the passenger in the front seat Dellen Graf who watched the entire event unfold And testified similar to the officers regarding what happened after all mr. Gossman elided from the vehicle What why was it reasonable to? Deploy a dog in that situation Again is at that point Officer Bosenberg had drawn his weapon and when when Jules or I'm sorry when mr. Gossman hopped out of the car mr. Officer Bosenberg tried to grab him and restrain him, but because one of his vehicle was in one of his arms He decided to holster his weapon and when he holstered the weapon Mr. Gossman was able to struggle and get away from him. No. I know I know the guy got away and ran I'm just wondering is it per se reasonable to Send a dog after a fleeing suspect was that yes, yes under the Swan in fact in your own case your honor man versus Yarnell from 2007 there was a canine that was used in that case and it was a Canine in a bite-and-hold maneuver was not an unreasonable use of force in that particular pattern And that's that's considered at least Less alternative least deadly option actually if for example the canine had been able to secure mr. Gossman and bring him to the ground without him pulling the weapon the arrest might have been effectuated Well, I don't think there's any they didn't have any basis to use deadly force before the gun came out so I'm but the Dog is I guess medium force under their policy And I just wondered But maybe that's not really the main issue here the main issues seem to be the stop and the use and the shooting Yeah, but that's your point judge call tonight as I said earlier What you said in fact the Zubrod case is that the court will hesitate to scrutinize a particular Tactical decision and the deployment of a canine versus a taser versus deadly force is a tactical decision That's made by an officer under situations that you know is made in under highly stressful Tense and certain rapidly evolving facts and an officer need not pursue the most prudent course of conduct as judged by 2020 hindsight, so I think given the precedent of the judges on this panel on the 8th circuit make it clear that This court will be reluctant to do Monday morning quarterbacking would it could have should or what might have happened I Just wondered if it's ordinary practice I guess in Cedar Rapids to send a dog after someone in this kind of situation as opposed to just old-fashioned chasing Well tracking him down later I'll tell you what triggers the use of a dog in a situation like this where We knew there was a shotgun that had was apparently in the vehicle Mr. Gossman sprung out of the car had not been padded down and immediately begin running down the street and The officers gave chase and had a canine on the scene It seemed to be the most prudent course to unleash the canine to allow the canine to secure the other victim and before he was able to elude arrest or Perhaps draw another weapon We'll never know obviously, but in a situation particularly where there hasn't been a pat-down of the suspect. It's particularly dangerous Can you address the reasonable suspicion for the stop? There's O'Donoghue who says that Purchasing two packets of pseudoephedrine doesn't get you there Yeah, and she's wrong on that your honor, and this isn't a thin basis to stop the vehicle in fact I believe this case when you after you read your Amling and Binion decisions in the state v. Houser case are going to find that there was more than enough Cumulative facts and collective knowledge of the officers what she neglected to mention is that? the two officers were skilled drug interdiction officers And they observed a truck that was parked at the Walgreens store at issue here And they identified two individuals who had a long history with methamphetamine Turner and Gutierrez, they also then were watching in real time on this NCLEX data system the fact that two occupants of the truck Santos and mr. Gossman made pseudoephedrine purchase in less than 20 minutes of each other and returned directly to the truck after each purchase and then similarly They they waited a little bit and found that miss Santos had made nine purchases and had been blocked once of pseudoephedrine and The fact that there was some fiddling going around they saw some lights in the backseat going Going on light went out some fiddling under the truck and then back in the truck Along with the multiple purchases and the fact that the two individuals split up and returned at the truck they Concluded that these two individuals were displaying abnormal and suspicious behaviors and Then after the truck left the Walgreens parking lot The record's clear that they begin driving quickly and making furtive and multiple turns In that neighborhood in the southwest side of Cedar Rapids on seven different streets So there's clearly enough reasonable suspicion to execute a Terry stop. This is not a thin set of facts at all It's very consistent with this court's decisions in Amling and Binion and What do you think are the undisputed facts at the time of the shooting What what exactly is? Undisputed about where the gun was located Before the shots were fired against. Mr. Gossman well Judge Strand cited two cases one of which you were on judge Colton Loper's the city of Litchfield That case involved a cell phone and there was no firearm but a mistaken belief it's if it's objectively reasonable does not violate the Fourth Amendment and The fact that the gun was displayed in officer Jones at the time Believed that he he heard his partner yell gun or Jesus gun And then he saw the flash and he saw his partner fall down led him to believe in any reasonable offer to officer to believe that that his officer had been shot and that the Firearm had been discharged by mr. Gossam. And that's that's the undisputed material facts here. There's no other evidence to deny any of that evidence So For those reasons then the city defendants request that you affirm a judge strand. Thank you for your time Very well. Thank you for your argument. Mr. Stone, mr. Donahue Would you like to make brief rebuttal in a minute or so? Please turn on your microphone and we'll give you one minute Your time had expired but we'll add one minute since mr. Stone gave us back four You have to take yourself off of mute though or we can't hear you What I wanted to say is there it's a theme throughout this case that I believe the plaintiff the defendants have been Misrepresenting the facts long wide and continuously and you need to look at what's in the record very carefully There actually wasn't any particular identification of Gutierrez as having anything to do with with drugs per se And that's the record After the case they found that Santos had purchased some more things Had a history, but they didn't know it at the time and there was no flash of the gun Officer Geringer did say he thought he saw the gun But Jones who I think was being referred to by mr. Stone Indicated that he never saw the gun go off and he never heard a flash or a bang. So I guess That's what I would have to say. So, thank you very well. Well, thank you for your arguments We thank both counsel for appearing and presenting their cases The case is submitted and the court will file an opinion in due course. Thank you for your time. Thanks. Mr. Stone Thank you